UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEVE STAEHR, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | Case No. |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| | ) | |
| THE HARTFORD FINANCIAL SERVICES GROUP, INC., THOMAS M. MARRA, RAMANI AYER, DAVID K. ZWIENER and DAVID M. JOHNSON, | ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

## INTRODUCTION

1.      This is a securities fraud class action on behalf of persons who purchased the publicly traded securities of The Hartford Financial Services Group, Inc.  ("Hartford Financial" or the "Company") between November 5, 2003 and October 13, 2004 (the "Class Period"), against Hartford Financial and its top officers, for violations of the federal securities laws arising out of defendants' dissemination of false and misleading statements concerning the Company's results and operations.

2.      Hartford Financial is a diversified insurance and financial services company. Through its subsidiaries, the Company provides investment products and life and property and casualty insurance to both individual and business customers in the United States and internationally.

3.      On October 14, 2004, *CBS MarketWatch* issued an article entitled "Spitzer attacks insurance industry; NY Attorney General sues Marsh over commissions."  The article stated in part:

> In his latest move in a high profile campaign against corporate wrongdoing, Eliot Spitzer charged several of the nation's largest insurance companies and the largest broker with bid rigging and pay-offs that the New York Attorney General says violate fraud and competition laws.
>
> Spitzer unveiled a law suit Thursday against the world's largest insurance broker Marsh & McLennan for a common industry practice known as "contingent commissions."
>
> Contingent commissions are paid by insurance companies to reward brokers for sending business their way.  Critics claim the payments encourage brokers to sell policies from those insurance companies offering the highest commissions, rather than the ones most suited to their customers.
>
> Two executives from American International Group have pleaded guilty to charges related to the payments, Spitzer said during a televised press conference.
>
> "The prevailing thought within the insurance community was that this investigation would result in minor disclosure changes or a slap on the wrist," said Adam Klauber, an analyst at Cochran, Caronia & Co.  "The fact that there are criminal charges suggests that Spitzer thinks parts of this business are really wrong and need changing."
>
> Shares of Marsh AIG and other leading insurance companies and brokers slumped.  Marsh dropped 14 percent to $39.70 and AIG lost nine percent to $60.70.

Ace Ltd., Chubb Corp., Hartford Financial, and Munich Re's Munich American Risk Partners were also involved in the scheme, Spitzer said.

Interestingly, AIG is headed by longtime CEO Hank Greenberg.  His sons Evan Greenberg and Jeff Greenberg are the CEOs, respectively, of reinsurer Ace and broker Marsh & McLennan.

Ace spokesman John Herbkersman said the company has received subpoenas from Spitzer as part of the investigation and is cooperating.

"The Hartford is cooperating fully with the New York Attorney's investigation," said ... a spokeswoman for the company.

4.      Upon revelation of these illegal acts, the Company's shares fell to $56, a loss of 9%.

5.      During the Class Period defendants disseminated materially false and misleading financial statements.  The true facts which were known by each of the defendants, but concealed from the investing public during the Class Period, were as follows:

(a)      That the Company was paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements;"

(b)      That by concealing these "contingent commissions" and such "contingent commission agreements" the defendants violated applicable principles of fiduciary law, subjecting the Company to enormous fines and penalties totaling potentially tens – if not hundreds – of millions of dollars;

(c)      That as a result of (a)-(b) above, as more fully described in ¶¶42-46, the Company's prior reported revenue and income was grossly overstated.

## BACKGROUND

6.      Hartford Financial is a diversified insurance and financial services company. Through its subsidiaries, the Company provides investment products and life and property and casualty insurance to both individual and business customers in the United States and internationally. Defendants sought to use its relationship with Marsh & McClennan ("Marsh") to inflate the Company's revenues and EPS.

7.     There are basically three types of entities in the insurance market.  First, there are clients: companies and individuals seeking to purchase insurance for their businesses, employees or themselves.  Second, there are brokers and independent agents (collectively "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage.  Brokers represent the client, obtain price quotes, present the quotes to the client, and make recommendations to the client that include factors other than price, such as differences in coverage, an insurance company's financial security, or an insurance company's reputation for service or claims payment.  Third, there are insurance companies.  They submit quotes to the brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.

8.     In this structure, the client makes two types of payments: (1) it pays its broker an advisory fee or a commission for locating the best insurer, and (2) it pays the chosen insurance company premiums for the coverage itself.  When the client pays a commission this is usually accomplished in one check to the broker, with the broker deducting the commission and forwarding the premium to the insurance company.  Sometimes clients – particularly large commercial clients – break out the broker's fee and pay it directly to the broker.

9.     In addition to the first commission payment described above, brokers sometimes receive another kind of payment, as well, but not one from the clients.  These are called contingent commissions and come from insurance companies pursuant to arrangements generally known as contingent commission agreements.  The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following: (1) how much business the broker's clients place with the insurance company; (2) how many of the broker's clients renew policies with the insurance company; and (3) the profitability of the business placed by the broker.

10.     During the 1980s and 1990s, the insurance brokerage industry underwent a period of consolidation.  Beginning in the late 1990s, Marsh centralized its organization and assumed greater control over both business placement and contingent commission agreements.  Marsh created an office in Manhattan that came to be called Marsh Global Broking, which oversaw policy placement decisions in Marsh's major business lines.  These included Excess Casualty, Healthcare, FinPro (Financial Products) and Middle Market (businesses paying less than one million dollars in annual insurance premiums).  Global Broking (also known as MMGB and MGB) was given authority over all of Marsh's contingent commission agreements and began to replace smaller local and regional contingent agreements with large national ones, called Placement Service Agreements, or "PSAs."

11.     Marsh did not limit its bid rigging practices to its large corporate clients.  It also engaged in such conduct with Hartford Financial – a provider of life group benefits, auto, home ownership and business insurance – with respect to Marsh's "Middle Market" and small business clients.

12.     Middle Market insurance provides coverage for companies where the annual premium ranges from tens of thousands of dollars to around $1 million.  Hartford Financial became a "partner market" – meaning it agreed to pay contingent commissions – with Marsh's so-called Advantage America program in July 2003.  The Advantage America program was developed by Marsh to fold its small commercial property/casualty business into its Middle Market group.  With annual premiums in the range of $25,000 to $200,000 dollars, this program provided coverage to small businesses.  Marsh centralized all of this small business insurance placement in an office in Lake Mary, Florida, near Tampa.

13.     Hartford Financial was given the advantage of office space in Marsh's Lake Mary facilities.  On numerous occasions during 2003 and 2004, Marsh employees asked the two Hartford Financial underwriters assigned to this facility, either in person or by telephone, to provide an

inflated quote or "indication" (non-binding proposed price) for insurance coverage for a small business. Typically, Hartford Financial's underwriters were told to price the quote or indication 25% above a particular number, and that by doing so Hartford Financial need not worry that it would get the business. Hartford Financial colluded in the scheme.

14.     Marsh did not restrict its bid rigging in the Middle Market to small businesses. Marsh's Los Angeles area Global Broking office handled larger Middle Market risks with annual premiums reaching $1 million. The Marsh Los Angeles office is in the same office building as Hartford Financial's. Marsh employees, on virtually a daily basis, asked Hartford Financial for inflated quotes or indications in a manner similar to the process described above for the Florida facility. In Los Angeles, however, Marsh often provided Hartford Financial with a spreadsheet showing the accounts for which it wanted Hartford Financial to provide a losing quote or indication, along with other insurers' quotes. It instructed Hartford Financial to quote some percentage, typically 25%, above the other insurers' quotes on the spreadsheet to ensure that Hartford Financial would not get the business. These were referred to as "Throwaway Quotes." Hartford Financial provided the inflated quotes.

15.     On even larger risks in Southern California, those of over $1 million of annual premium, Marsh similarly asked for inflated quotes or indications, also providing spreadsheets containing other insurers' quotes to Hartford Financial. Hartford Financial provided these quotes as well. Hartford Financial provided these quotes and indications because Marsh was its biggest broker, and it felt that Marsh would limit its business opportunities if it refused.

### JURISDICTION AND VENUE

16.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

17.     Venue is proper here pursuant to §27 of the 1934 Act.  Acts and transactions giving rise to the violations of law complained of occurred here.

## THE PARTIES

18.     Plaintiff Steve Stachr purchased Hartford Financial securities detailed in the attached Certification and was damaged thereby.

19.     Defendant Hartford Financial a diversified insurance and financial services company. Through its subsidiaries, the Company provides investment products and life and property and casualty insurance to both individual and business customers in the United States and internationally. During the Class Period, Hartford Financial had approximately 293 million shares of common stock outstanding, which shares traded in an efficient market on New York Stock Exchange.

20.     Defendant Ramani Ayer ("Ayer") is the Chairman of the Board, President and CEO of the Company.  During the Class Period, Ayer sold $1.5 million worth of his Hartford Financial shares.

21.     Defendant David K. Zweiner ("Zweiner") is the Executive Vice President and a director of the Company.  During the Class Period, Zweiner sold $21 million worth of his Hartford Financial shares.

22.     Defendant Thomas M. Marra ("Marra") is the Executive Vice President and a director of the Company.  During the Class Period, Marra sold $13 million worth of his Hartford Financial shares.

23.     Defendant David M. Johnson ("Johnson") is the Executive Vice President and CFO of the Company.

24.     Defendants are liable for the false statements pleaded herein, as those statements are each "group-published" information for which they are responsible.  The defendants named in ¶¶20-23 (the "Individual Defendants"), by reason of their stock ownership and positions with and relations

to Hartford Financial were controlling persons of Hartford Financial.  Hartford Financial in turn

controlled the Individual Defendants.  The Individual Defendants and Hartford Financial are liable

under §20(a) of the 1934 Act.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

25.    On November 5, 2003, the Company issued a press release entitled "The Hartford

Reports Third Quarter Net Income of $343 Million, or $1.20 Per Diluted Share; Increased 2003 and

Initial 2004 Guidance."  The press release stated in part:

> The Hartford Financial Services Group, Inc.  reported net income per diluted share of $1.20 for the third quarter of 2003, up from $1.06 per diluted share in the third quarter of 2002.  Net income increased 29 percent to $343 million in the current period from $265 million in the third quarter of 2002.

> Ramani Ayer, chairman and CEO of The Hartford, said, "During the quarter, our execution has been strong with both of our life and property-casualty operations benefiting from the favorable market conditions.  Total revenues are up 21 percent over the prior-year period.

> **"The Hartford's record annuity sales, which helped drive nearly $2.5 billion in annuity net flows in the third quarter, clearly demonstrates that our annuity products remain the best in class and a benchmark for the industry to follow," said Ayer.  "The new generation of annuity products introduced last quarter is proving, as we anticipated, to be eagerly welcomed by a baby boomer population that is aggressively planning for retirement.  The great sales numbers we have achieved speak to the attractiveness of our products and the strength of our distribution," he added**.

> Reviewing a quarter in which the property-casualty operations reported record operating earnings, Ayer continued, "Across our ongoing property and casualty segments, margins continue to expand, allowing us to achieve our targeted returns and profitably grow the business into 2004 and beyond.  We are equally excited about our improved regional presence that, combined with our solid ratings and strong balance sheet, gives The Hartford good momentum going into next year."

> Net realized capital gains totaled $8 million (after-tax) in the current quarter versus net realized capital losses of $100 million (after-tax) in the same period last year.

> The Hartford's operating income rose 30 percent in the third quarter of 2003 compared to the third quarter of 2002, excluding two items: the $40 million after-tax effect of the previously announced increase in Bancorp litigation reserves in 2003, and a $76 million tax benefit relating to prior years in 2002.  Operating income is not

calculated based on generally accepted accounting principles ("non-GAAP"). Information regarding non-GAAP financial measures used in this release is provided in the Discussion of Non-GAAP Measures section below.

For the nine months ended Sept. 30, 2003, the company reported a net loss of $545 million as a result of the first quarter increase in asbestos reserves, compared to net income of $742 million for the comparable period of 2002.  Net realized capital gains totaled $141 million (after-tax) for the nine months ended Sept. 30, 2003, versus net realized capital losses of $207 million (after-tax) in the same period last year.

*Ayer said, "This year has seen The Hartford take strong steps to assure its continued financial health by adding a large increase to its legacy asbestos reserves.  The burden that those reserves put on us was real, but the earnings power of our businesses today has enabled us to make significant strides toward covering the charge.  Whether or not there is legislative action on asbestos in Washington this year, we remain confident that our prudent actions have conservatively addressed today's asbestos environment*."

26.     On November 7, 2003, defendant Zwiener sold 150,000 Hartford Financial shares at

$57.09 per share.

27.     On January 16, 2004, the Company issued a press release entitled "The Hartford

Announces Pricing of Common Stock Offering."  The press release stated in part:

The Hartford Financial Services Group, Inc., today announced that it has priced its previously announced common stock offering for gross proceeds of approximately $400 million.  The company priced 6.325 million shares of common stock at $63.25 per share.

28.     On January 28, 2004, the Company issued a press release entitled "The Hartford

reports net income of $454 million, or $1.59 per diluted share."  The press release stated in part:

The Hartford Financial Services Group, Inc., one of the nation's largest investment management and insurance companies, today reported its results for the fourth quarter of 2003, delivering net income per diluted share of $1.59, up 57 percent from $1.01 per diluted share in the fourth quarter of 2002.  Net income increased 76 percent to $454 million in the current period from $258 million in the fourth quarter of 2002.  Net realized capital gains totaled $29 million (after-tax) in the current quarter versus net realized capital losses of $38 million (after-tax) in the same period last year.  Included in the net realized capital gains and losses are periodic net coupon settlements on non-qualifying derivatives of $8 million (after-tax) and $5 million (after-tax) in the fourth quarter of 2003 and 2002, respectively.

"*The results we announced today cap a quarter and end a year with a company that is stronger, bigger, and better prepared for the road ahead than it was 12 months ago,*" said The Hartford's Chairman and CEO Ramani Ayer.

"*It was a record quarter on many fronts: record annuity sales, record mutual fund sales, record property-casualty operating income, solid combined ratios and written premiums for business insurance exceeding $1 billion for the first time ever*.

"*Our story today is about more than a good quarter; it's about an extraordinary year in which our team took some hits, made some tough decisions and emerged with a balance sheet in much better shape*.

"*Early in the year, our expense actions initiated a major process to improve our cost competitiveness.  At the same time, the comprehensive ground-up study of our asbestos reserves addressed deteriorating trends in the asbestos environment. None of it was easy, but all of it was needed to position us for future profitable growth*.

"*We ended the year by acquiring many of CNA's group benefits businesses, bolstering our team in key areas.  We always said we would seize appropriate opportunities to widen the reach of our business, and the CNA deal is an example of our determination*.

"*This has been an outstanding quarter and a great end to a pivotal year for the company.  Excellent operating results, favorable equity markets and a strong business model allows us to look confidently toward a new year,*" Ayer added.

29.     On March 4, 2004, the Company issued a press release regarding the Company's

$200 million offering of senior notes.  The press release stated in part:

> The Hartford Financial Services Group, Inc.  announced that it had priced an offering of its 4.75 percent senior notes due March 1, 2014 for gross proceeds of approximately $200 million.

> ... The Hartford intends to contribute the net proceeds to its subsidiary, Hartford Life, Inc., which intends to use the net proceeds, plus available cash, to redeem on March 15, 2004, $250 million aggregate principal amount of its 7.20 percent Junior Subordinated Deferrable Interest Debentures, due June 30, 2038.

30.     On May 4, 2004, the Company issued a press release entitled "Earnings from the First

Quarter of 2004 are Released; The Hartford reports net income of $568 million, or $1.93 per diluted

share."  The press release stated in part:

> The Hartford Financial Services Group, Inc., one of the nation's largest financial services and insurance companies, today reported first quarter of 2004 net

income per diluted share of $1.93, up from the loss of $5.46 per diluted share in the first quarter of 2003. Net income increased to $568 million in the current period from a loss in the first quarter of 2003 of $1.4 billion. Net realized capital gains, which are included in net income, totaled $95 million (after-tax) in the current quarter versus net realized capital losses of $29 million (after-tax) in the same period last year.

"I am very pleased by the results we are posting today. Net income is approaching two dollars per diluted share, totaling $568 million in all. Our advances in operating income for our property-casualty and life operations, both year-over-year and sequentially, bode well for the coming year, in which we work toward continued profitable growth," said The Hartford's Chairman and CEO Ramani Ayer.

"Even excluding the reserve addition in the first quarter last year, the 47 percent increase in our operating income (1) compared to that quarter and the 16 percent increase from our record fourth quarter show that The Hartford continues to fire on all cylinders.

"As a diversified financial services company, the roughly even contribution to our bottom line from both our property-casualty and life operations strengthens and differentiates us. This quarter, property-casualty operating income was $297 million and life operating income was $256 million. ***We're proud to point out that these are record numbers for both operations***.

"***Beyond the bottom line, our property-casualty operations this quarter showed encouraging combined ratios and healthy advances in business insurance and personal lines new business***.

"***On the life side, most observers of The Hartford will be impressed, as I am, with record total annuity sales of $4.7 billion and a 33 percent increase in variable annuity sales over the first quarter of 2003. This, combined with continued forward momentum for our group benefits, mutual funds, and 401(k) businesses, translates to a satisfying quarter on nearly every front. And across the sea, too, our business in Japan continues to impress those who have tuned in to its growth***.

"***It's an exciting time at The Hartford. In March, our official corporate partnership with the NCAA brought our rapidly growing mutual funds front and center on network television in a program that will continue throughout the year. At the same time, our distinctive campaign boosted the presence of The Hartford's long admired brand***.

"***It's early in the year, to be sure, and in an uncertain time no one can foresee all that lies ahead, but looking at the numbers we have posted from the first three months of the year, we're encouraged for the months to come,***" Ayer added.

31.     Also on May 4, 2004, *Bloomberg* issued an article entitled "Hartford Says SEC Subpoenas Annuity, Mutual-Funds Operations." The article stated in part:

Hartford Financial Services, Inc., the largest U.S. seller of variable annuities, said the Securities and Exchange Commission had subpoenaed records of its variable annuities and mutual-fund operations.

32.     On May 20, 2004, the Company issued a press release entitled "Doing Business 'The Hartford Way'; The Hartford's CEO Addresses Annual Shareholder Meeting."  The press release stated in part:

> The Hartford stayed true to its mission in 2003, held closely to its core values and emerged a stronger company in a better competitive position, said Ramani Ayer, chairman and CEO of The Hartford Financial Services Group, Inc. at the company's annual shareholder meeting.
>
> *     *     *
>
> "Our success was driven by doing business The Hartford way," Ayer added. "We value extraordinary people; we are disciplined and have a healthy respect for risk; we do the right thing, not necessarily the easy thing; we focus on execution, decisiveness and innovation; and we're relentlessly committed to providing outstanding service.
>
> "Doing business The Hartford way does more than explain our past performance – it's also the key to our future growth," said Ayer.
>
> *     *     *
>
> In The Hartford's life operations, Ayer stated, improving demographics is one of many reasons the company expects continued growth.  "This new generation of older Americans will be wealthier and live longer than any before it.  Potential customers understand that we are a financially disciplined company and that we'll be there when they need us," he said.
>
> *     *     *
>
> "We have created a trajectory for significant future growth," said Ayer.  "As we work to serve our policyholders, we are also working to protect and grow our shareholders' wealth."
>
> Ayer concluded, "I feel good about the year behind.  I am confident about the years ahead."

33.     On May 21-24, 2004, defendant Zweiner sold 200,000 Hartford Financial shares for $65.26-$65.27 per share.

34.     On June 10, 2004, *Bloomberg* issued an article entitled "Hartford Financial Gets Subpoena From New York Attorney General."  The article stated in part:

Hartford Financial Services Group, Inc., the largest U.S. seller of variable annuities, said it received a subpoena from the New York Attorney General's office regarding compensation agreements with insurance brokers.

Hartford intends to cooperate fully with the inquiry, it said in a statement.

35.     On August 4, 2004, the Company issued a press release entitled "The Hartford reports second quarter 2004 net income of $433 million, or $1.46 per diluted share; Leadership strategy in service, technology and distribution drives growth in key areas; assets under management reach an all-time high." The press release stated in part:

> The Hartford Financial Services Group, Inc., one of the nation's largest financial services and insurance companies, today reported second quarter 2004 net income of $433 million or $1.46 per diluted share. Net income includes net realized capital gains of $31 million (after-tax) or $.11 per share and a $118 million charge (after-tax) or ($.40) per share resulting from results of a review of casualty reinsurance recoverables. In the second quarter of 2003, net income was $507 million or $1.88 per diluted share, which includes net realized capital gains of $176 million (after-tax) or $.65 per share.

> The Hartford's operating income rose to $403 million in the second quarter of 2004 from $340 million in the second quarter of 2003, up 19 percent. Even in a quarter with an adjustment to the reinsurance recoverable asset, the company has achieved a return on equity over the last 12 months in excess of 15 percent.

> "We're very proud of The Hartford's results this quarter. Anyone who has followed The Hartford in recent years knows that we are building a company that will compete vigorously over the long term, on our terms, both in the United States and internationally," said The Hartford's Chairman and CEO Ramani Ayer. "The Hartford is also committed to increasing shareholder value as demonstrated by a 17-percent rise in book value per share to $40.26, excluding accumulated other comprehensive income, over the second quarter of 2003. Operating return on equity at 15.6 percent exceeded the company's target range of 13 to 15 percent over the last 12 months.

> "***Today's results provide further evidence that our strategy is working across all fronts – commercial lines, personal lines, life and investment products***.

> "The Hartford is proving through its performance that to win in our business you need more than a competitive cost structure; you have to provide your distribution partners with sophisticated product and pricing strategies, outstanding service and leading-edge technology that allow customers to protect their businesses and property, and grow their investments.

> "In our property and casualty operations, the results we share today show an impressive record of product innovation and performance. Our small and middle

market businesses have long been seen as leaders in the commercial insurance industry. Our future is even brighter as our Dimensions auto and homeowners products are taking hold in the market and our Xpand product is gaining traction with independent agents who serve small businesses.

"In our life operations, The Hartford's market-leading variable annuities are also providing great value for customers. The variable annuity platform was the basis for another generation of products in long-term growth markets. Our retail mutual funds, 401(k) and 529 plans are helping to serve the needs of retirees and Baby Boomers nearing retirement and individuals and families just beginning to grow their savings.

"When a business model succeeds in the United States, it makes sense to export it to other economies. The global demographic trends that are playing out today, combined with the distribution, service and technology for which we have long been known, explain why observers of The Hartford are seeing such impressive results from our business in Japan. As Japanese consumers focus on their future, we think this is just the beginning.

"***Even as we continue to profitably grow and expand our product lines, we have remained attentive to our exposure to legacy issues. In the first quarter, we confirmed that our gross asbestos reserves were appropriate. In the second quarter, we reviewed our casualty reinsurance arrangements, and made a change in the amounts that we expect to recover from our reinsurers***.

"***As we look back on the second quarter, we are very encouraged by what we've seen. Our business is performing well at all levels, despite flat equity markets and growing competition in the property-casualty side of the business. We are on the right track to meet our goals," Ayer added***.

(Footnote omitted.)

36.     On August 10, 2004, defendant Ayer sold 25,822 Hartford Financial shares at $61.01 per share.

37.     On September 21, 2004, defendant Marra sold 217,074 Hartford Financial shares at $64.00 per share.

38.     On September 30, 2004, the Company issued a press release entitled "The Hartford Estimates Third Quarter Earnings." The press release stated in part:

The Hartford Financial Services Group, Inc. today estimated its 2004 third quarter earnings per fully diluted share at between $0.85 and $0.95. This estimated range assumes no net realized capital gains or losses or unusual tax benefits in the quarter. This projection includes several large estimated losses:

- 13 -

- $86 million after-tax for Hurricane Charley;

- $74 million after-tax for Hurricane Frances;

- $38 million after-tax for Hurricane Ivan; and

- $49 million after-tax for an increase in environmental reserves.

"Given these events, our property-casualty bottom line for the quarter will be significantly lower than expected," said Ramani Ayer, chairman and CEO of The Hartford. "Fortunately, our competitive position and new business margins remain strong and we expect to report continued double-digit growth in property-casualty written premium for the third quarter.

"While property can be repaired, and our claim teams are hard at work helping our customers rebuild, lives upended by catastrophe can take much longer to recover. Our thoughts are with every person in every area affected by this seemingly relentless season of storms," Ayer added.

The Hartford's estimate of the impact of the hurricanes includes reinstatement premiums associated with The Hartford's reinsurance programs. The estimate of third quarter earnings per share does not include an estimated loss for Hurricane Jeanne or an estimate for any possible assessments from Citizens Property Insurance Corporation, the State of Florida's residual property insurance market. The Hartford expects to incur losses from Jeanne, and may incur an expense for assessments, but will be unable to complete a gross or net loss estimate for several weeks.

"Loss estimates are evolving, even for earlier storms," continued Ayer. "Some areas have been hit two, or even three, times. The unprecedented strain on area resources is raising the cost of remediation and repair." The Hartford may further revise its estimates of the impact of Charley, Frances and Ivan if these trends have an even greater loss impact than is currently anticipated in these estimates.

Prior to Hurricane Jeanne, The Hartford had full coverage in place under its 2004 catastrophe reinsurance program for two large events. The Hartford's principal catastrophe reinsurance program provides coverage, on average, for 88 percent of $695 million of catastrophic property losses incurred from a single event in excess of a $125 million retention. The exact amount and percentage of coverage varies by layer. The Hartford also participates in, and has additional coverage from, the Florida Hurricane Catastrophe Fund and other reinsurance programs relating to particular risks or specific lines of business.

In the third quarter, The Hartford also completed an annual ground-up review of environmental liabilities. As a result of this work, The Hartford incurred a $49 million after-tax loss to increase reserves. "We did not expect this review to lead to an increase," said Ayer. "Our environmental liability has been stable in recent years and, in fact, this review found no underlying trend or change in the claim environment that accounts for the increase." The change in estimate arose from identified changes in the particular circumstances of each account. The key feature

of The Hartford's work was a detailed evaluation of over 600 individual environmental exposures.

"Our action demonstrates our continued commitment to rigorous and regular examination of these exposures to ensure reserve adequacy," continued Ayer. The Hartford expects the charge to reflect similar changes in both gross and net environmental exposure.

39.     On October 14, 2004, *CBS MarketWatch* issued an article entitled "Spitzer attacks insurance industry; NY Attorney General sues Marsh over commissions." The article stated in part:

In his latest move in a high profile campaign against corporate wrongdoing, Eliot Spitzer charged several of the nation's largest insurance companies and the largest broker with bid rigging and pay-offs that the New York Attorney General says violate fraud and competition laws.

Spitzer unveiled a law suit Thursday against the world's largest insurance broker Marsh & McLennan for a common industry practice known as "contingent commissions."

Contingent commissions are paid by insurance companies to reward brokers for sending business their way. Critics claim the payments encourage brokers to sell policies from those insurance companies offering the highest commissions, rather than the ones most suited to their customers.

Two executives from American International Group have pleaded guilty to charges related to the payments, Spitzer said during a televised press conference.

"The prevailing thought within the insurance community was that this investigation would result in minor disclosure changes or a slap on the wrist," said Adam Klauber, an analyst at Cochran, Caronia & Co. "The fact that there are criminal charges suggests that Spitzer thinks parts of this business are really wrong and need changing."

Shares of Marsh AIG and other leading insurance companies and brokers slumped. Marsh dropped 14 percent to $39.70 and AIG lost nine percent to $60.70.

Ace Ltd., Chubb Corp., Hartford Financial, and Munich Re's Munich American Risk Partners were also involved in the scheme, Spitzer said.

Interestingly, AIG is headed by longtime CEO Hank Greenberg. His sons Evan Greenberg and Jeff Greenberg are the CEOs, respectively, of reinsurer Ace and broker Marsh & McLennan.

Ace spokesman John Herbkersman said the company has received subpoenas from Spitzer as part of the investigation and is cooperating.

"The Hartford is cooperating fully with the New York Attorney," said ... a spokeswoman for the Company.

- 15 -

40.     On these revelations, the Company's shares fell to $56 from $62.30, a drop of 9%.

41.     The true facts which were known by each of the defendants, but concealed from the investing public during the Class Period, were as follows:

(a)     That the Company was paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements;"

(b)     That by concealing these "contingent commissions" and such " contingent commission agreements" the defendants violated applicable principles of fiduciary law, subjecting the Company to enormous fines and penalties totaling potentially tens – if not hundreds – of millions of dollars;

(c)     That as a result of (a)-(b) above, as more fully described in ¶¶42-46, the Company's prior reported revenue and income was grossly overstated.

### MISLEADING FINANCIAL STATEMENTS

42.     In order to overstate its earnings during the Class Period, Hartford Financial violated Generally Accepted Accounting Principles ("GAAP") and SEC rules by failing to properly report and disclose the illegal nature of its revenue during the Class Period.

43.     These financial statements and the statements about them were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for and disclosure about its revenues, in violation of GAAP and SEC rules.  Hartford Financial manipulated financial statements by allowing the Company to generate fees which it was not entitled to, which revenues may be forfeited (via fines, judgments and costs associated therewith) and which artificially inflated Hartford Financial's revenue and income.

44.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R.  §210.4-01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and

inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R.  §210.10-01(a).

45.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No.  28, 10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, 34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, 40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, 50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although

investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, 42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, 58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, 79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, 95, 97).

46.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DEFENDANTS' SCIENTER

47.     Defendants are Hartford Financial's top officers and directors.  Each of the Individual Defendants, by virtue of their high-level positions with Hartford Financial, directly participated in the management of Hartford Financial, was directly involved in the day-to-day operations of Hartford Financial at the highest levels and was privy to confidential proprietary information concerning Hartford Financial and its business, operations, products, growth, financial statements

and financial condition and was aware of or deliberately disregarded that the false and misleading statements were being made by and regarding the Company.  Because of their managerial positions with Hartford Financial, each of the Individual Defendants had access to the adverse undisclosed information about Hartford Financial's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

48.    Defendants were personally familiar with the quality of the Company's revenues/income because they monitored Hartford Financial's revenue, closely monitoring the performance of Hartford Financial's operations via reports from Hartford Financial's Finance Department, which were generated and provided to the Individual Defendants on a regular basis. The reports summarized the sales, amount billed, credit terms and product type.  As a result of their monitoring, defendants were aware that Hartford Financial would be unable to meet its projected results, unless they continued to engage in their illegal scheme.  Defendants were also or should have been keenly aware that their "record" results were actually the result of illegal "contingent agreements."  Defendants furthermore sold in excess of $37 million worth of their personal Hartford Financial shares and issued $600 million worth of shares and notes using a defective Registration Statement.

### CLASS ACTION ALLEGATIONS

49.    This is a class action on behalf of purchasers of Hartford Financial publicly traded securitieis during the Class Period, excluding defendants (the "Class").  Excluded from the Class are officers and directors of the Company, as well as their families and the families of the defendants. Class members are so numerous that joinder of them is impracticable.

50.    Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly

disregarded that their statements were false; and (iv) artificially inflated the prices of Hartford Financial's publicly traded securities and the extent of and appropriate measure of damages.

51.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### FIRST CLAIM FOR RELIEF

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

52.     Plaintiff incorporates by reference ¶¶1-51 herein.

53.     Defendants violated §10(b) and Rule 10b-5 by:

(a)     Employing devices, schemes and artifices to defraud;

(b)     Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of Hartford Financial publicly traded securities.

54.     Class members were damaged as they paid artificially inflated prices for Hartford Financial's publicly traded securities in reliance on the integrity of the market.

### SECOND CLAIM FOR RELIEF

**For Violations of §20(a) of the 1934 Act**
**Against All Defendants**

55.     Plaintiff incorporates by reference ¶¶1-54 herein.

56.     The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the 1934 Act, 15 U.S.C.  §78t(a), as alleged herein.  By virtue of their stock

ownership, high-level positions, and participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

57. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Hartford Financial controlled the Individual Defendants and all of its employees.

58. By reason of such wrongful conduct, defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of the wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding plaintiff and other members of the Class damages together with interest thereon;

C.      Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.      Awarding plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  October 15, 2004                    SCOTT + SCOTT, LLC
                                            DAVID R.  SCOTT (CT16080)
                                            ERIN GREEN COMITE (CT24886)


                                            _____/s/_____
                                            ERIN GREEN COMITE

                                            108 Norwich Avenue
                                            Colchester, CT  06415
                                            Telephone:  860/537-3818
                                            860/537-4432 (fax)

                                            SCOTT + SCOTT, LLC
                                            ARTHUR L. SHINGLER III
                                            401 B Street, Suite 307
                                            San Diego, CA  92101
                                            Telephone:  619/233-4565
                                            619/233-0508 (fax)

                                            LERACH COUGHLIN STOIA GELLER
                                               RUDMAN & ROBBINS LLP
                                            WILLIAM S.  LERACH
                                            DARREN J.  ROBBINS
                                            401 B Street, Suite 1700
                                            San Diego, CA  92101
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)

                                            Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Hartford Financial.doc